ANTHONY RAGGIO

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa January 22, 1891.*

1. NEW TRIAL—*in criminal case—verdict against the evidence.* In this case, which was a prosecution upon an indictment for murder, there was a conviction of manslaughter, and judgment accordingly. Upon a review of the evidence, on error, it was considered not sufficient to connect the accused with the homicide, and that it was error in the trial court to refuse to grant a new trial on the defendant's motion.

2. PRACTICE—*improper remarks of the State's attorney—when error.* Where there is good reason to fear that a conviction of a homicide is not the result of a dispassionate consideration of all the evidence, and the evidence of the defendant's guilt is not free from a reasonable doubt, aside from the evidence given in exoneration, it is material error for the court to allow the State's attorney, in his closing argument to the jury, over the defendant's objection, to make remarks and statements wholly outside of the case and not justified by the evidence, calculated to inflame the minds of the jury, and is ground of reversal.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

Messrs. DWIGHT & KERN, and Messrs. MILLS & INGHAM, for the plaintiff in error:

The evidence did not sustain the conviction, and failed to show that the defendant inflicted the fatal wound, or that the deceased died from such wound.

There was substantial error in overruling defendant's objections to the improper remarks and statements of the State's attorney not justified by any evidence. *McDonald* v. *People,* 126 Ill. 152; 1 Bishop on Crim. Proc. 311; *Martin* v. *State,* 63 Miss. 507; *Brown* v. *Swineford,* 44 Wis. 290; *Mitcham* v. *State,* 11 Ga. 616; *Sasse* v. *State,* 68 Wis. 530; *Stone* v. *Stone,* 22 Texas, 191; *Cobble* v. *Cobble,* 79 N. C. 590; *Turner* v. *State,* 4 Lea, 207.

Mr. GEORGE HUNT, Attorney General, for the People:

The evidence was sufficient to authorize the verdict, and while some of the State's attorney's remarks can hardly be commended, they do not afford sufficient ground for reversal.

Mr. JUSTICE WILKIN delivered the opinion of the Court:

Plaintiff in error, together with Thomas and Michael Raggio, his brothers, and Frederick Dahl, was indicted by the grand jury of Cook county for the murder of Edward Kelly. At the trial, after the evidence for the prosecution was closed, the court instructed the jury to return a verdict of not guilty as to the three last named defendants. Plaintiff in error was convicted of manslaughter, and sentenced to ten years' imprisonment in the penitentiary. He prosecutes this writ of error, and insists, first, that the verdict is not supported by the evidence, and second, that the assistant prosecuting attorney was allowed to make statements, in his closing address to the jury, unwarranted by the evidence, and calculated to prejudice the jury against him.

On the night of June 17, 1888, about eleven o'clock, the prisoner and his co-defendants were together on the west side of South Clark street, in Chicago, near a saloon,—No. 396. A number of other parties were also there. Thomas and Michael Raggio were quarreling with Dahl when deceased and Bert Kern came up. Words passed, and a fight immediately ensued between the three Raggios and Dahl on one side, and the deceased and Kern on the other. Plaintiff in error struck the deceased, and was in turn knocked down twice or oftener by him. There is much evidence in the record (which will be noticed hereafter) to the effect that immediately after the fight between the prisoner and his party and Kelly and Kern had ceased, several boys or young men standing by made an attack on Kelly, and that a struggle ensued between him and them, in which he was struck several times, and in which he knocked several of his assailants down. It is satisfactorily established

by the evidence, that during one of these encounters Kelly received a wound in the neck, and left the scene of the struggle bleeding profusely. On the following day the county physician made a post mortem examination "on the body of a young man," (not named or particularly described by him,) in the morgue at the Cook county hospital, and found death had resulted from a cut upon the left side of the neck, extending through the carotid artery and jugular vein. It is insisted on behalf of plaintiff in error that the proof fails to identify that body as the body of Edward Kelly.

While it is true that little attention seems to have been given by the prosecution to showing where the deceased went after the fight, when and where he died, or how his body reached the morgue, yet we think enough appears from the evidence to show that the body examined by the county physician on the following day was that of the deceased named in the indictment. The question of difficulty in the case is, does the proof show, beyond a reasonable doubt, that plaintiff in error inflicted the mortal wound. It must be conceded that the evidence on this branch of the case is in irreconcilable conflict.

Bert Kern, who was with the deceased when the fight began, and engaged in it, testified, in substance: "They (the Raggios and Dahl) ran at us and got to fighting with us; I was struck by Mike Raggio; he shoved me out of the way; then Tony (plaintiff in error is referred to by witness by the name Tony) got at Ed, (deceased) and they were fighting together; just as Mike shoved me, Tony went for Ed; then Tom picked up a chair and struck me on the head; when I was struck by the chair I was knocked down; I seen Tony at Ed; they were slapping each other,—pounding each other; I guess Tony struck Ed first; I did not lose consciousness; I was no more than down than I was up again; I seen Tony with a knife next when I got up; Ed Kelly was standing near the lamp-post at that time; Tony was immediately by Ed; had a knife in his hand; when I saw the knife I got up and run; when I saw

Tony with the knife he was about two feet from Kelly; they were fighting each other; I ran south to Polk street; was followed by three or four, but don't know who they were." On cross-examination, he said the knife he saw was a pocket knife,—that he could tell from the blade whether it was a butcher knife or a knife to be shut up.

Andrew Vanders testified on behalf of the People: "Tony was fighting with Kelly at the lamp-post; I seen him (Tony) receive a kick, and then go away after receiving it; after Tony went away Kelly went to the assistance of Kern, who had been knocked down with the chair; I was standing between the door and lamp-post, right near the fighting, in the middle of the sidewalk; Tony went into North's saloon before Kelly went to Kern's assistance; it was after Tony went into the saloon that Kelly left the lamp-post to go to his partner, or where his partner was; Tony came out with a knife in his hand,—a carving knife; blade about five inches long; I next see Tony cut the fellow in the neck; he stood there and bled awhile; then Kern ran toward Polk street, and a couple followed him; the man that was cut stopped and bled awhile by the saloon door; he stopped in front of my place and bled, and then he went right down the street; he stood there, and he sees that the patrol wagon was coming up, and he says, 'Boys, I'm done.'

Q. "Do I understand you to say that you yourself saw Tony Raggio cut Kelly with the knife?

A. "Yes; I was standing between the lamp-post and the door—about five feet from the door—when I saw Tony go into the saloon; I heard him ask for a knife; I could not tell you the man that was asked.

Q. "Did you see the man he asked?

A. "Well, I was looking at the man he asked for the knife.

Q. "Where was the man standing?

A. "He was standing near the counter—he was standing in there as you go back by the alley.

Q. "Do you know Hank North?

A. "Yes.

Q. "Did you see him?

A. "I do not remember seeing him; I saw his bar-tender in there.

Q. "Did you hear anybody say anything to Raggio?

A. "I heard the man tell him he didn't have no knife; then I saw Tony come out; there was a big crowd pretty near filling the sidewalk between the door and lamp-post; they were standing all around me; I got a front seat; I made the remark, 'Kill him,' while coming across the street before getting the front seat; I saw the police when they came in the patrol wagon; the man that was stabbed says, 'Boys, I'm done;' don't know who he said it to; at that time he was cut somewhere about the neck."

Sol Friedman testified, that after the prisoner had been knocked down at the lamp-post by the deceased he went into the saloon, and was in there about a minute, and came out with something in his hand, but he could not tell what it was, and did not see him do anything with it. He says that after that he saw Kern knocked down with a chair, and that when he got up he ran away; that he then saw deceased go over to where Kern had been knocked down, and looked around, and then walked away; that he went back to the saloon, saw no blood, thought it was a little fight, and went away.

Eugene Sullivan testified, that when the deceased "got hold of the lamp-post, they (meaning the prisoner and his brothers) kept running at him, and he kept knocking them down; then Tony ran into the saloon; then Kelly ran as far as the stoop, and I saw Tony have a knife; it looked like a carving knife, or something of that sort;" that the crowd then ran up to the saloon door, and he saw no more; that nothing had happened to the crowd when he started home. He also says, when he left, Tony was standing in the door of the saloon.

Jacob Franks testified to seeing Tony and deceased fighting at the lamp-post, and says Kelly knocked Tony down, and that he got up and ran into the saloon, chased by Kelly, who went as far as the door, and came back with his hand to the right side of his neck, and saw the blood coming through his fingers.     This witness' testimony is to the effect that plaintiff in error ran some five steps into the saloon, while the deceased only reached the door. He also says: "When Tony got about five feet in, I did not see him; I guess he must have gone all the way through;" that immediately after the deceased came back bleeding he ran north toward Harrison street, and that the first that he saw of Tony after he went into the saloon was when he met him ten minutes after, on Polk street.

Abe Foster testified he saw the fight around the lamp-post while standing in the street, and then went to the doorway of the saloon, and he says: "When I was standing in the doorway, after the fight around the lamp-post had ceased, he (Tony) stepped into the saloon, and asked Hank North would he loan him a knife." He further says: "When Tony was struck by Kelly he staggered and fell; quickly after that Tony rushed into the saloon.

Q. "Then it was from the fight at the lamp-post you saw him rush in?

A. "Yes, sir; after he rushed past me I did not turn round to look at him at all; after hearing him ask for a knife I turned to look if he got the knife, and when I turned round to look he was already gone; North refused the knife; he went about three steps into the saloon; then I went away; the fight was pretty near over when I went away; I went right away after he had gone into the saloon; did not see him come out; I saw Kelly at the lamp-post, only; did not see him come toward the building from the post; did not see Kelly, and did not see him bleeding; whether he was cut or not I can not say; could not say whether he had gone away or not; as I stood in the doorway Tony went by me; he asked North for a

knife; North refused him; turned to see if he got the knife, and Tony was gone, and I went away; don't know where Tony was at that time."

Edward Levi testified that he saw the fight, and says he saw a good many men and boys fighting Kelly at the lamp-post; that he (Kelly) walked away from the lamp-post toward Harrison street; Kelly started toward Harrison street from right by the lamp-post. The evidence of the wife of this witness is to the effect that the parties separated immediately after Kern was knocked down, the prisoner, his brother Mike, and Dahl, going toward Polk street, while the other parties went north.

L. Berman, introduced by the prosecution, swears positively that the cutting was done after the fight between the prisoner and deceased had ended, and while the latter was fighting with other parties. He says: "When Tony was knocked down he got up and jumped toward North's door, and then the fellow with Kelly jumped in with the revolver; held the revolver in one hand and struck out with the other; plenty of people around Kelly at that time,—ten, twelve or fifteen; could not say how many; at that time the boys were fighting with Kelly; he had cooled a little when the fellow jumped in with the revolver, and then he went to fighting again; then he got ten or twelve boys who jumped on him, and there is where he got stabbed."

Kern, by his own testimony, shows that he was in no position or condition to know what took place between plaintiff in error and Kelly. The proof is overwhelming that he, immediately after the fight began, displayed a revolver, and that he continued to flourish it until knocked down; yet he swears most positively that he had no weapon of any kind.

No one can read the testimony of Andrew Vanders without seriously questioning its truthfulness. The record shows that the trial was adjourned on Saturday, March 15, to the following Monday morning, when this witness was called by the

prosecution.    He was objected to by defendants' counsel be-
cause his name was not on the back of the indictment, and
no notice had been given that he would testify until a few min-
utes before he was called.    In answer to an inquiry by the
court as to when the State first learned of the witness, the
assistant State's attorney answered, "about five minutes before
the defense was notified."    In ·answer to the question to the
witness by the defendants' attorney, "Tell the jury if it is not·
the fact that you never spoke to a human being about the case
until you spoke to the prosecuting attorney this morning,"
he answered, "Not in God's world."    He further said : "Told
Mr. Elliott this morning what I knew of the occurrence of
June 17, and that is the first time I ever told a human being
about it."    He admits that he remained in the neighborhood
of the homicide from the time it occurred to the trial.    Also,
that he had seen and spoken to a brother of deceased the day
before, and that morning came into the court room with him.
Other witnesses introduced by the People swear that he was
in the same saloon with this brother the day before he testi-
fied, and, on cross-examination, one of them testified : "Kelly
asked him (Vanders) to take a drink ; Vanders got 'up, took a·
drink, and went back to play cards ; then Kelly said he wanted
to see him ; Vanders said, 'All right—when the game is over ;'
then the two of them went over, sat down, and talked together ;·
Kelly talked to the colored man ; they talked together about
ten minutes ; then they went out together."    This evidence is
uncontradicted and unexplained.

It is passing strange that a man with ordinary feelings of
humanity, and intelligence, knowing that a human life had
been taken, as this witness swears he knew Edward Kelly's
had been, should remain absolutely silent for months,—that,
too, when during the progress of the trial he had the most
favorable opportunity to inform a brother of the deceased that
he saw plaintiff in error inflict the mortal wound.    He says he
went to the scene of the fight hallooing "Kill him."    He speaks

of "getting a front seat," as though the scene of the homicide had been a place of amusement. It is also remarkable that, notwithstanding many persons were, as he admits, standing around him, no one' saw the stabbing but himself. On the contrary, the overwhelming weight of the testimony offered by the prosecution is, that after the prisoner went into the saloon he did not come out again through the front door, and that he and deceased did not afterwards meet in front of it. The general reputation of Vanders for truthfulness was impeached by three witnesses,—policemen. No one contradicted these witnesses.

Plaintiff in error testified in his own behalf: "About eleven o'clock I asked my brothers Mike and Tom to go home; they said, 'Not now—wait a little longer;' I went back to North's door again and commenced talking with a friend of mine; talked a few minutes, when my attention was called to Kelly and Kern fighting with my two brothers; first I saw was Tom staggering, and then fall; I went to his assistance; Kelly knocked him down; I was knocked down by Kelly, and when we got to the lamp-post Kelly knocked me down again and. kicked me in the privates; that made me feel so bad I went' to North's door and remained there; when I got to North's door the fight stopped; after that there was another fight just north of the lamp-post, between John Guion Pedro, Peter Fear and Kelly; Peter Fear commenced it when Kelly was putting on his clothes; they fought there for a few minutes; there was a great crowd there; Kelly then went north; I stopped there for a while, and then went into North's saloon; saw the bar-tender there, but no one else; went through the saloon to Pacific avenue, then to Polk; met my brother; then to Clark, and met Franks, and started down Clark street, home; when we got near the Twenty-second street police station we were all arrested by officers Cary and Trehorn, taken to the station, separated, examined and searched by Lieut. Aarch, who took us into his room, one at a time, and asked us about the case;

I told him the same story that I have just told; Franks was with me all the time after leaving there until we were arrested; after I was knocked down and kicked by Kelly, and while standing in North's door, I saw Kelly standing about a foot or two feet away from the lamp-post fighting with another crowd there; before he got to fighting he was close to the lamp-post, putting on his clothes; he was under the light, where I could see him, while putting on his clothes; he was not cut at that time; I did not cut him, and do not know who did; did not go into North's for a knife, nor have a knife in my hand; I never carry a knife; did not ask North, or any one else, for a knife; had no controversy whatever with Kelly after he knocked me down and kicked me, and I went to North's door, as I have testified."

James S. Walker, bar-tender in North's saloon, testified that he was in the saloon at the time of the fight; that hearing the "fuss" he went to the door and saw the crowd,—some fifty or seventy-five people,—but could not tell who were fighting. He then went back behind the bar, and five or ten minutes after, Tony Raggio came in the front door and stayed not over five minutes, and while there some one came in and said the man is dead, and Tony went out the back door, and the witness saw him no more. He swears that when Tony came in the saloon he came directly to the bar; he did not go to the other side of the room; did not come in from the beginning of the trouble until that time; did not go out at the front door after coming in; that there were knives behind the lunch counter, on the opposite side of the room, but they could not be reached from the front of that counter; that Tony got no knife there that night; that he did not ask for a knife in the saloon that night; that he (the witness) was the only one attending the saloon at the time, and that North was not there until after the trouble was over. North corroborates him as to not being in the saloon during the fight, and swears that he had gone to

bed, and only came in after the difficulty was over; that the prisoner did not ask him for a knife that night.

John Heller testified that he also saw the difficulty, and says Kelly knocked Tony down the second time, and that he (Tony) went and stood in the saloon doorway, and he stayed there. He says, "by that time there was a whole lot of young men started the fight up again with Kelly." He also swears that Tony took no part in the last fight.

James McGreeney and Richard R. Buckley swear that they were standing in the doorway of the saloon at the time Kelly and plaintiff in error were fighting at the lamp-post; that Tony was knocked down and kicked at by Kelly; that Tony got up and came to the doorway, and stood beside them. McGreeney says: "After that occurred, there were eight or more young fellows, between eighteen and twenty-two years old, run up and got hold of Kelly; he threw one of them into the street, and then six or seven jumped on him again; we were standing in the door, when all at once some one hollowed, 'He's cut;' after Tony Raggio was knocked down and came and stood beside us in the door, I had a good view of Kelly, and could not see any marks on him." He says further, there was a good light there; that when Kelly kicked at Tony, he saw no cut or blood on him; that if there had been any blood he would have seen it; that the last fight lasted about three minutes. These statements are substantially corroborated by the witness Buckley. To the same effect is the testimony of Reka Berman, who swears: "Kelly struck Tony; Tony fell down, got up, ran, and stood in North's door; he didn't go into the saloon, but stood in the doorway." He also says: "He kind of brushed his vest for a minute or two, and then the boys jumped on Kelly, and there was another fight." In answer to the question, "What did you next see, with the crowd around the lamp-post?" he answered: "They were fighting yet, and Tony was standing in the doorway yet, and then some one hollowed, 'He's cut;' Tony did not leave the door; I was standing near

Tony, on the platform; Mr. Heller was also standing there; there was quite a crowd around there."

The evidence shows that the platform in front of the saloon, and between it and the sidewalk, was about six feet wide. The lamp-post spoken of by witnesses was at the outer edge of the sidewalk. Several witnesses for the defense testified that the next morning after the fight they examined the place and found blood on the sidewalk, but none on the platform or near the door of the saloon.

The foregoing is the substance of all the evidence shown by the abstract (the correctness of which is not questioned) tending to throw light on the question as to who inflicted the mortal wound upon the deceased. In considering the weight and credibility of the evidence of the several witnesses, it must be borne in mind that it is not shown or pretended that any other than the wound in the neck was inflicted upon the deceased, and that that wound must have resulted in immediate death. We have considered this evidence in all its different phases, and we are wholly unable to deduce, from even that of the prosecution, alone, a satisfactory conclusion that plaintiff in error inflicted the wound which caused the death of Kelly. The preponderance seems to be clearly the other way.

It is said in the argument, that there was a joint unlawful attack by plaintiff in error and others on Kelly, with an intent to beat him, and if, in the execution of that unlawful purpose, one of the joint actors unlawfully caused the death, all acting together are guilty. The difficulty in the case is, that the proof fails to show who did cause the death, and therefore fails to show that the prisoner was in any way acting in concert with the one who did the stabbing; but the theory of the prosecution throughout the trial was, that the plaintiff in error was guilty as principal,—that he himself struck the mortal blow,—and we are unable to discover any other theory, consistent with the evidence, upon which the verdict of the jury could possibly be sustained.

Giving due consideration to the wholesome rule, that verdicts of juries should only be interfered with by courts when they are manifestly unauthorized by the evidence, we are constrained, by a careful consideration of the evidence in this record, to hold that the court below erred in refusing to sustain the prisoner's motion for a new trial, on the ground that his guilt was not established by the evidence.

Many of the remarks and statements of the assistant State's attorney, in his closing speech to the jury, objected to by counsel for the defendant, were wholly outside the case, unauthorized by the evidence, and calculated to inflame the minds of the jury to the prejudice of the defendant. The trial court erred in overruling defendant's objections to these statements, and while a court of review will always hesitate to set aside a conviction for such error alone, yet in a case like this, where there is much reason to fear that the verdict was not the result of a dispassionate consideration of all the evidence in the case, it becomes material and substantial error. We think both grounds of reversal urged on behalf of plaintiff in error are sustained.

. The judgment of the Criminal Court must be reversed, and the case remanded.

*Judgment reversed.*