THE STATE OF KANSAS, *Appellee,* v. ALBERT HINKLEY, *Appellant.*

No. 16,490.

SYLLABUS BY THE COURT.

1. EVIDENCE—*Self-serving Declarations.* In the trial of a murder case evidence of a declaration made by the defendant previous to the homicide, offered for the purpose of disproving malice or ill will and as tending to prove a proper spirit of friendliness toward the deceased, was properly excluded as a self-serving declaration.

2. ——— *Procedure to Obtain Inspection or Copy of Documents*

The State v. Hinkley.

*under Control of Opposing Party.* In order that a defendant in a criminal action may avail himself of the provisions of section 209 of the criminal code and sections 368 and 369 of the civil code (Gen. Stat. 1901, §§ 4816, 4817), providing for an inspection and copy or permission to take a copy of a paper or document under the control of the attorneys for the state, he must, where compliance with the demand is refused, ask for and obtain an order from the court or judge requiring the adverse party to give him, within a specified time, an inspection and copy or permission to take a copy of such paper or document. The mere serving of notice of a demand for an inspection as provided in section 368, without obtaining such order, is not sufficient.

3. ——— *Right of Defendant to Inspection—Demand Refused—Introduction Over Defendant's Objection.* In this case, *held,* in common fairness the defendant should have been permitted before going to trial to inspect the transcript of the testimony taken at the coroner's inquest, it appearing that it contained evidence material to his defense, that no transcript or report of the testimony had been filed as the law requires in the office of the county clerk, and that the original transcript of such testimony was in the possession or under the control of the county attorney.

4. CRIMINAL LAW—*Statements of Opinion by Prosecutor in Argument—Immaterial Error.* In the trial of a criminal action, where the defendant was charged with murder, the prosecuting attorney in his closing argument to the jury used this language: "I believe that Hinkley shot that man leaning against that building deliberately and with malice." The statement was objected to and a motion made that the jury be instructed to disregard it. The objection and the motion were overruled. *Held,* that the ruling, while technically erroneous, can not be regarded as prejudicial, it sufficiently appearing that the opinion was drawn from the evidence and was not a mere statement of a belief based upon something outside of the evidence.

5. ——— *Abusive Language by Prosecutor in Argument.* Where a claim of error is based upon abusive language of the prosecuting attorney in his closing argument, the true test is whether or not the language objected to was so improper as to prejudice the jury against the accused and deprive him of a fair trial.

6. ——— *Scope of Argument by Prosecutor — Improper Remarks—Presumption.* In the argument of a criminal case it

is proper for the prosecuting attorney to comment upon or discuss inferences which may be drawn from the evidence; if those inferences are illogical or erroneous the presumption is that the jury were not influenced by them; and where extravagant or exaggerated statements are made or some portion of the evidence is stated erroneously a new trial will not be granted unless it appears that the accused was prejudiced thereby.

7. —— *Misstatement of Law by Prosecutor in Argument — Instruction to Disregard Refused — Error Cured by Instruction Stating the Law.* In a criminal case, where the defendant was charged with murder and admitted the killing, but pleaded self-defense, counsel for the state in the closing argument used this language: "If he thought he was in danger, he might and should have avoided it by stepping back." An objection to this statement and a motion for an instruction that the jury disregard it were overruled, the court at the time stating that as a legal proposition the defendant was not compelled to flee, but the court "supposed the counsel was simply drawing his deductions as to what the conduct of the defendant should have been under the circumstances, not what he thought his duty was under the law." To this suggestion of the court counsel for the state agreed. *Held*, in view of the written instructions expressly stating that the defendant was under no obligation to flee if the deceased was in the act of assaulting him in such a manner that he reasonably believed himself in danger of great bodily harm, the refusal to sustain the objection and instruct the jury to disregard the misstatement of law made by counsel was not prejudicial error.

Appeal from Osborne district court; RICHARD M. PICKLER, judge. Opinion filed January 8, 1910. Affirmed.

*Charles H. Nicholas,* and *Richard H. Towne,* for the appellant.

*Fred S. Jackson,* attorney-general, *John Marshall,* assistant attorney-general, and *Charles D. Shukers,* special assistant attorney-general, for the appellee.

The opinion of the court was delivered by

PORTER, J.: Albert Hinkley was charged with murder in killing Thomas Le Rock by shooting him with a pistol. The jury found him guilty of murder in the first degree and he was sentenced to the state penitentiary for the period of his natural life. He appeals, and assigns a large number of errors which it is insisted entitle him to a new trial.

The homicide occurred on December 2, 1908, at the town of Alton, in Osborne county. The appellant was a recent comer to the little town, having arrived in July. In September he opened a pool and billiard hall, which he conducted for his aunt, who owned the building, and with whom he lived. He was forty years old, maimed by having lost his left hand, and was ruptured. The deceased, Thomas Le Rock, was twenty-seven years old and had lived all his life in that community. He was strong and vigorous, six feet in height, and weighed 170 pounds. He was in the habit of becoming intoxicated, and when in that condition was turbulent and quarrelsome. He had been arrested and fined in the police court several times for drunkenness and disturbing the peace, twice for assault with deadly weapons, and once for resisting an officer. He frequented the pool and billiard hall conducted by the appellant, and on the day of the killing had been there in the morning and in the afternoon, leaving with the appellant about seven o'clock. After supper he returned and was playing pool with a young man named Stickley. He was under the influence of liquor, and while the game was in progress became sick and started for the rear door, vomiting on the floor, and went outside, where he remained from ten to fifteen minutes. The appellant had been watching the game of pool and had complimented some of the plays made by the deceased, and they appeared at that time to be on friendly terms. When Le Rock became sick and went outside the appellant remarked that he

was too drunk to play, and instructed Conover, an assistant, to rack up the balls and give the game to Stickley. Conover then discovered that two of the balls and a cue were missing, and informed the appellant, at the same time telling him that "Rocksy" had them. The appellant told him to go out and get them. In about five minutes Conover returned with the cue and billiard balls and put them in their racks; then, going to the front of the room where the appellant was sitting on the end of a counter talking to some others present, said to him: "Tom wants to see you." The appellant, without making any reply, got off the counter, walked across the room, opened the rear door, and disappeared from the view of those within, leaving the door open. Almost immediately thereafter a pistol shot was heard and Le Rock walked into the hall, followed by appellant, who held in his hand a revolver. The witnesses disagree as to what was said when the parties returned to the room. One witness testified that the appellant said, "You're G— d— right I hit him," and asked some one to go for a doctor. The appellant testified that some one asked, "Did you hit him?" and that he replied, "I don't know," and then, seeing the deceased throw up his hands to his breast, said, "Yes, he is hit; go for a doctor." After the shooting Le Rock sat down on a bench for a moment, then fell to the floor and expired. About this time the appellant left the hall, leaving word where he could be found, and shortly afterward was arrested at his home.

Physicians testified that the wound which caused the death of deceased was in the breast, about nine inches below the chin; that it was straight in, not deflected up or down. They examined the body of deceased immediately after the shooting and found no weapon. There was no witness as to what took place outside the hall except the appellant. He testified as follows:

"After Conover came back with the cue and balls and racked them up he came to the counter and said: 'Tom

wants to see you.' I then went out the east door at my usual gait, or walk. Did not know what Le Rock wanted. I started right away to see what he wanted. As I went out I left the door open. There are windows on both sides of the door. I stepped from the door a little way; did not see Le Rock at first, then observed him between the door and the south window, sitting down, or leaning back against the building when I first went out. I said: 'Tom, what do you want?' Le Rock said: 'Hink, you son-of-a-bitch, I am going to kill you.' I says: 'What is the matter with you?' Le Rock then said: 'I mean it; your time has come to die.' At that time he was standing up. As he said this he grabbed for his left hip pocket; I grabbed for my pocket, took out a revolver, and shot at Le Rock. I did not take any aim. I sure thought he was going to shoot me at that time and place, which is the sole reason that caused the shot to be fired at that time and place. I shot just once. I was about five feet away at the time I shot. He said nothing after I shot, but went in the hall. I followed an instant after he walked in. Le Rock went over by the stove. Some one, I think it was Pickenpaugh, asked if I had hit him. I said: 'I don't know.' Then later I said: 'He is hit; go for the doctor.' Le Rock just then sat down on the bench. Some one asked why I did it. I said: 'I can't stand there and be shot.' I said, in addition, something about him calling me out and reaching for his hip pocket. I don't remember just clear what I did say. I remember making that remark about his hip pocket."

He further testified that he had had no words with Le Rock after the latter came back to the hall that night; that he was not angry with him, and had no hard feeling against him whatever. There was testimony showing that Le Rock had caused a slight disturbance in the billiard hall on the evening before. At that time the appellant was about to close the hall, intending to go to supper, and Le Rock ordered him in a half-joking way not to turn out the lights. About the same time Le Rock threw a billiard ball across the room at another man who had just entered. The testimony is that the appellant told him not to do that; that the balls were made to play with and not to be thrown around.

The appellant testified that in the evening after this occurrence he hunted up the city marshal and complained to him about Le Rock creating a disturbance, and asked the marshal to come over to the hall. A witness for the state testified that the conversation with the marshal took place in the butcher's shop at four o'clock in the afternoon the second day before the killing, and that the appellant spoke of Le Rock having made a disturbance and remarked that if Le Rock came into his billiard hall and started anything he would shoot him full of holes. This witness was corroborated by the marshal, who said he did not think the appellant meant it as a threat; that he did not seem to be angry or particularly excited. As the only disturbance at the hall in which Le Rock had been concerned occurred on the evening of the day before the killing, it is apparent that these witnesses were mistaken as to the time of the conversation, and they may have been mistaken as to what the appellant said. The marshal, who was an old man, testified that he was very deaf and could not always hear what was said.

Another witness for the state, a young man about eighteen years old, testified that the appellant passed him as he left the room before the shooting and appeared to the witness to be angry. Stickley testified that after the deceased had gone outside he heard a remark made by the appellant to some one near the end of the counter; in substance, that Le Rock had been creating a disturbance and that if he started anything the appellant would end it. The same witness said that he heard a shot fired within about half a minute after the appellant went outside, and that he immediately started running and went out of the west door. On redirect examination he was asked what his reason was for starting for the front door, and answered: "When I heard the statement I kind o' looked for trouble, and I did n't want to be there." He had previously testified that he saw nothing in the demeanor or conduct

The State v. Hinkley.

of the appellant which would lead him to believe that the latter was angry or mad. The other witnesses for the state, as well as those for the appellant, testified that nothing occurred at the hall during the evening indicating bad feeling between the men, and that when the appellant was told that Le Rock wanted to see him he left the room without any sign of anger or impatience.

There are eighty-seven separate assignments of error, only a few of which have been regarded as of sufficient importance to be urged in the brief. We have, nevertheless, examined all of them with as much care as possible, because, in view of the absence of any affirmative testimony contradicting the appellant's story as to what occurred outside the room immediately before the shooting, and the slight evidence tending to prove a motive for the killing, the verdict of first degree murder seems somewhat remarkable.

The errors insisted upon relate to the admission of evidence, the alleged misconduct of counsel for the state, and the refusal to grant a new trial. We have been unable to find any substantial error in the admission of evidence. It is wholly improbable that the rights of the appellant could have been prejudiced by permitting the man at whom the deceased threw the billiard ball to testify that afterward the deceased apologized for his conduct. The testimony of witness Pilcher, to the effect that the appellant in a conversation several days before the homicide said he was going to get a gun to protect his place of business because the officers of the city had refused him protection, was competent and relevant to show motive for taking the life of the deceased. Some of the testimony of this witness was hearsay; for instance, that he had heard that the appellant was having trouble with a man named Clair; but no prejudice resulted, because the appellant afterward testified to having had trouble with Clair as an excuse for carrying the revolver.

Much stress is laid on the refusal to admit evidence of a conversation which the appellant claims to have had with the druggist, Leach, in which he informed the druggist of the disturbance in the billiard hall on the evening of December 1 and requested him not to sell the deceased any more liquor. The testimony was offered for the purpose of disproving malice or ill will, and as tending, on the other hand, to show a proper spirit of friendliness toward deceased. It was manifestly objectionable as a self-serving declaration, and was properly excluded. (*The State v. Asbell,* 57 Kan. 398.)

It is claimed that over the objections of the appellant the state was permitted to use as evidence portions of the transcript of the testimony of some of the witnesses, including that of the appellant, taken at the coroner's inquest. The objection was made on the ground that previous to the trial the appellant had served a written notice demanding of the county attorney permission to inspect and take a copy of the testimony at the coroner's inquest, and particularly that portion given by the appellant. The notice was served under the provisions of sections 368 and 369 of the code of civil procedure (Gen. Stat. 1901, §§ 4816, 4817), which section 209 of the criminal code makes applicable to trials of criminal cases. The notice sufficiently described the character of the papers of which inspection was demanded. On the matter being brought to the attention of the court the attorneys for the state said that they knew of no papers of the kind referred to which they would care to use on the trial. There the matter was allowed to rest until the objection was interposed to the use of the transcript on the trial. The section of the code under which the demand for the inspection was made expressly provides that if compliance with the demand be refused the court or judge, on motion and notice, may in his discretion order the

adverse party to give to the other within a specified time a copy or an inspection of the paper or document demanded. The difficulty with the appellant's claim of -error is that the provision of the statute requiring that an order be obtained from the court requiring production of the document was never complied with. No order of the court was asked for or obtained. Notice, without such order, is not sufficient. (17 Cyc. 460 and cases cited.)

We agree with counsel for the appellant that in common fairness they should have been permitted before going to trial to inspect the transcript of the testimony taken at the coroner's inquest. It is a record which the law requires to be filed in the office of the county clerk (Gen. Stat. 1901, § 1772), and which the appellant and his counsel had as much right to examine as counsel for the state. For some reason it was never filed with the county clerk, and it appears that it re-- mained in the possession of the former county attorney. The appellant had been a voluntary witness at the inquest and had told his story. This was before he had retained counsel for his defense, and it was natural that his counsel should desire to examine the transcript of his testimony in order properly to prepare for his trial. It is doubtful if any excuse can be urged for depriving him of the right to inspect such a record, unless it be founded in the mistaken notion of the rights of a person accused of crime and the relations which the state bears toward such a person. The state is never interested in the conviction of an innocent person, but, on the contrary, is interested in his acquittal. This does not mean that it is the duty of the prosecuting attorney to act as the advisor of accused persons or to conduct their defense. Unless he has good reason to believe that the accused is innocent the prosecuting attorney must use his best efforts to convict; but he should refrain from doing anything

unfair or prejudicial to the rights of the accused to a fair trial. The prosecutor's duty to the state does not require him to withhold evidence which the accused in justice is entitled to the benefit of, nor justify him in treating the accused unfairly in the argument or in remarks made in the presence of the jury.

In this connection it is claimed that counsel were guilty of misconduct in their argument to the jury. In referring to the appellant the county attorney said: "I would n't be here if I did n't believe he was guilty." An objection to this was sustained and the jury were instructed to disregard the statement. Another attorney for the state said in the argument: "I believe that this man was still sitting down when he was shot." On objection the court informed the attorney that he could not state his belief, but might state what he believed from the evidence. Afterward, notwithstanding this admonition, another attorney for the state said to the jury: "I believe that Hinkley shot that man leaning against that building deliberately and with malice." The statement was objected to and a motion made that the jury be instructed to disregard it. The objection and the motion were overruled. It has been held by some courts reversible error for the prosecuting attorney in his argument to declare his individual opinion or belief, not expressly stated to be on the evidence, that the accused is guilty. (*Broznack v. The State,* 109 Ga. 514; *Raggio v. The People,* 135 Ill. 533; *Howard v. Commonwealth,* 110 Ky. 356; *People v. Fielding,* 158 N. Y. 542. See, also, 12 Cyc. 580 and cases cited.) In *People v. Dane,* 59 Mich. 550, a conviction was reversed because the prosecuting attorney said in his argument that he knew that the defendant was the man who took the money.

It is proper, however, for the prosecuting attorney to argue to the jury that the evidence, in his opinion, shows guilt. Where, as in this case, it sufficiently ap-

pears that the opinion is drawn from the evidence, and is not a mere statement of a belief based on something outside of the evidence, the expression of the opinion can not be regarded as prejudicial.

Further complaint is made because the attorney for the state said in his closing argument: "Albert Hinkley had undoubtedly been a black sheep in some family. He had been a wanderer on the face of the earth. It may be that his aunt invited him to come to Alton in hopes that he would settle down and become a good citizen." An objection and motion to disregard were overruled. In the case of *The State v. Baker,* 57 Kan. 541, a judgment of conviction was reversed because of the abusive language of the prosecuting attorney in his closing argument. In that case the attorney used the following language: "He is a sharper, a villain and a knave." (Page 545.) He also used this language:

"Gentlemen of the jury, this man Baker is a first-class scoundrel; he is a knave and a cheat; he is a bad man, and a dangerous man, and it is your duty, gentlemen of the jury, to see that he is not turned loose on the community. You should convict him. Sharpers can not ply their calling in Jewell county." (Page 546.)

The court denied a request in that case that the jury be instructed to disregard the offensive language, and failed to condemn the misconduct of counsel. It was held that the "noninterference of the court when its attention was challenged to the abusive language may have led the jury to think that the court indorsed the statements of the county attorney, and thus enhanced the prejudice." (Page 546.) In the syllabus of the case of *The State v. Gutekunst,* 24 Kan. 252, it was said:

"It is the duty of the district courts to interfere of their own motion in all cases where counsel in argument in jury trials state pertinent facts not before the jury, or use vituperation and abuse, predicated upon alleged facts not in evidence, calculated to create prejudice against a prisoner."

54—81 KAN.

In *Huckell v. McCoy,* 38 Kan. 53, it was said:

"Certainly where counsel in his closing argument to the jury repeatedly makes improper remarks, prejudicial to the interests of the adverse party, and over the objections of the adverse party, and the verdict is afterward rendered in favor of such counsel's client, and may have been procured by reason of such remarks, a new trial should be granted." (Page 59.)

Both of the last-mentioned cases are cited with approval in the opinion in *The State v. Baker,* 57 Kan. 541. The true test is whether or not the language objected to was so improper as to prejudice the jury against the accused and deprive him of a fair trial. (*The State v. Comstock,* 20 Kan. 650; *Combs v. The State,* 75 Ind. 215; *Inman v. The State of Georgia,* 72 Ga. 269.) A very thorough discussion of the subject will be found in a note to *People v. Fielding* (158 N. Y. 542) in 46 L. R. A. 650.

Jurors are presumed to possess ordinary intelligence. It is proper in the argument for counsel to comment upon and discuss inferences which may be drawn from the evidence; if those inferences are illogical or erroneous the presumption is that the jury were not influenced by them; and where extravagant or exaggerated statements are made or some portion of the evidence is stated erroneously a new trial will not be granted unless it appears that the accused was prejudiced thereby. Of course, where there is good reason to fear that the conviction is not the result of a dispassionate consideration of all the evidence, and especially where the evidence of the appellant's guilt is not free from a reasonable doubt, a court would be justified in giving weight to a claim of error based upon improper remarks made by counsel for the state in the argument, or upon any conduct on his part calculated to inflame the minds of the jury. (*Raggio v. The People,* 135 Ill. 533.) The facts in this case are not such as, in our opinion, would authorize us to say that the con-

duct of counsel in the matters we have referred to were such as to deprive the accused of a fair trial.

There remains one other claim of error which is deemed of sufficient importance to require comment. In the closing argument counsel for the state, referring to the appellant, used this language: 'If he thought he was in danger, he might and should have avoided it by stepping back." To this statement the appellant objected and moved for an instruction to disregard. The objection and motion were overruled, the court at the time stating that as a legal proposition the appellant was not compelled to flee, but the court "supposed the counsel was simply drawing his deductions as to what the conduct of the defendant should have been under the circumstances, not what he thought his duty was under the law." To this suggestion counsel for the state at once agreed. It is insisted that the statement of the counsel, as qualified by the court's comment, was tantamount to saying that the appellant was bound to a higher duty than that imposed by the law; that this amounted to a misstatement of the law to the jury, and permitted them to take into consideration some kind of moral obligation resting upon the appellant to retreat; that notwithstanding the law did not require him to retreat some duty rested upon him to do so, and his failure to retreat might be considered by them in determining his guilt. There is considerable force in the argument, and we have no doubt that the court should have directed the jury to disregard the statement of counsel. Courts have frequently held that in case of misstatements of law by the prosecuting attorney it is prejudicial error for the court not to instruct the jury to disregard it. (*The State v. Young,* 99 Mo. 666; *People v. Lange,* 90 Mich. 454.)

But the statute requires this court to give judgment without regard to technical errors or defects in cases of this kind, unless they affect the substantial rights of the parties. It appears that the court in the written

instructions carefully informed the jury that the appellant was under no obligation to flee if the deceased was in the act of assaulting him in such a manner that he reasonably believed himself in danger of great bodily harm, and that under such circumstances he could lawfully stand his ground, and that if it reasonably appeared necessary to him at that time to shoot to protect himself from death or great bodily harm he was justified in so doing. In view of this instruction the error must be regarded as technical. Another consideration which impels this view is that the verdict of conviction can only be explained upon the theory that the jury disbelieved the appellant's story of what transpired after he left the room. This the jury had a right to do.

The case is not without its difficulties. Two circumstances told strongly in favor of the appellant: Admitting that he made the reckless statement at different times that if Le Rock started a disturbance in his pool hall he would shoot him, there is no evidence that Le Rock started any disturbance after these statements were made; and there is nothing shown in the conduct of the deceased toward the appellant up to the time he was taken sick and left the room which would account for the presence in the mind of a normal person of such ill will or hatred as to furnish a motive for the crime. At the same time, it can be said that nothing was shown in the evidence that would account for the threat which the appellant says the deceased made to kill him, except that the deceased was intoxicated, and, as the evidence shows, was in the habit of using the epithet which the appellant testifies he applied to him at the time the threat was made. The story of the appellant as to what the deceased said to him may have been true; and it may have been the mere talk of a drunken man and not sufficient under the circumstances to justify a belief in the mind of the appellant that he was in danger of death or great bodily harm.

The other circumstance in the appellant's favor is

The State v. Hinkley.

that the uncontradicted evidence shows that the encounter would not have occurred at the time and place had it not been that the deceased sent word for the appellant to come to him. If, however, there was evidence from which the jury were justified in finding that the appellant had at any time prior to the act of shooting formed a willful purpose to kill the deceased, it matters not when that purpose was formed, whether hours or days before or on the instant that the shot was fired. We think there was some evidence to support a finding to that effect, and, as there is no substantial error in the record, the judgment is affirmed.

SMITH, J. (dissenting) : The defendant in this case was convicted of murder in the first degree, which of course involves the unlawful killing of another with deliberate and premeditated malice aforethought. In view of the almost total lack of evidence on the part of the state to show that the homicide was deliberate and premeditated, and in view of the numerous errors which are fairly pointed out and discussed in the opinion, some of which I think were material and prejudicial to the defendant, I think that the motion for a new trial should have been sustained, and that the court erred in overruling it. In view of the violent character of the deceased, known to the defendant, the defendant's account of what occurred immediately before the homicide would appear reasonable upon its face, and, if a revolver had been found upon the body of the deceased after his death, would appear very convincing. The circumstances disclosed by the evidence show that the defendant had no reasonable opportunity to know whether or not the deceased had a revolver on his person at the time of the shooting.