THE STATE OF KANSAS, *Appellee,* v. N. T. OLSEN, *Appellant.*

No. 18,089.

SYLLABUS BY THE COURT.

1. HOMICIDE—*Challenging Jurors for Cause.* Decisions upon challenges to jurors for cause are sustained upon the authority of *The State v. Morrison,* 67 Kan. 144, 72 Pac. 554, *The State v. Stewart,* 85 Kan. 404, 116 Pac. 489, and *The State v. Truskett,* 85 Kan. 804, 118 Pac. 1047.

2. —— *Argument—County Attorney.* Remarks of the county attorney in argument are considered, and it is held that the appellant's rights were not infringed thereby.

3. INSTRUCTION—*Failure of Defendant to Testify.* An instruction to the effect that the jury should not consider the failure of the defendant to testify as raising any inference of guilt is not erroneous.

4. ARGUMENT—*County Attorney—Vituperation.* The defense of insanity having been interposed to a charge of murder the county attorney in his opening argument, after referring to the evidence on that issue, said that the jury might protect the defendant "under the guise of a passing brain storm, . . . but he is a murderer." It is held that while vituperation and vilification should be avoided, inferences fairly deducible from the evidence and predicated thereon may be stated.

5. EVIDENCE — *Exclamation of Three-year-old Daughter.* A daughter of the deceased three years old was present while her father was being killed by the repeated cuts of a corn knife, and exclaimed, "Oh, poor papa, do die." This exclamation was related by her mother in the course of her narrative of the occurrence. It is held that the denial of a motion to strike out this exclamation was not erroneous.

6. ——— *Emotional Insanity—Insanity at Time of Trial.* A medical witness, after giving his opinion in answer to a hypothetical question that the defendant was insane when the homicide was committed, testified on cross-examination that "based on that question this kind of insanity would be fairly termed emotional insanity, or impulsive insanity, or there may be several names applied to it, . . . insanity is not classified alike by all writers; it would be similar to what we call irresistible impulse, . . . sometimes it is termed moral insanity." Counsel then offered to prove that the witness had made an examination of the defendant during the trial and found him insane. It is held that in view of the testimony already given by this witness and others tending to show that the mental disorder existing at the time of the homicide was of a temporary, sudden or impulsive nature and not of a continuous character, and of other circumstances stated in the opinion, the rejection of the offer was not prejudicial error.

Appeal from Morris district court. Opinion filed November 9, 1912. Affirmed.

*Joseph G. Waters, John C. Waters,* and *George P. Morehouse,* all of Topeka, and *J. M. Miller, M. B. Nicholson,* and *W. J. Pirtle,* all of Council Grove, for the appellant.

*John S. Dawson,* attorney-general, and *C. A. Crowley,* county attorney, for the appellee.

The opinion of the court was delivered by

BENSON, J.: The appellant was convicted of murder in the second degree in killing Walter H. Newfarmer. The appellant was the manager of a farm owned by his father. He had employed the deceased and his wife to work upon the farm and lived with them.

From the testimony of Mrs. Newfarmer it appears that about five days before the homicide she had rebuked the appellant for an improper proposal and intimated that her husband could take everything he had from him for alienating her affections. This occurred on Wednesday. On the following Saturday the appel-

lant notified Newfarmer of his discharge from employment. On Sunday he visited a neighbor, and talked of a trap that had . been set for him. The following Monday, in the absence of Newfarmer. in town, the appellant asked Mrs. Newfarmer for shells for the shotgun, saying he wanted to shoot a steer. The shells were not found. In a few minutes another interview between them occurred. He was pale, nervous, and agitated. She inquired the cause of the trouble with her husband. He said there had been none but that he (the husband) must quit, the quicker the better. Being further pressed for a reason he declared that trouble was weighing him down. She inquired if the discharge of her husband had anything to do with what had passed between them. He said: "Yes; I. thought you had laid a trap and was planning and plotting against me, to take everything I have from me."

She said that she had never spoken to her husband on the subject, and that all he wanted was what was coming to him, and said: "If you will be brave I will do all I can to help you out of your trouble and I will try and get Walter to." He replied that he would try to patch it up with Walter and that he might come back to work in the morning. He appeared nervous and pale, said his trouble was weighing him down, and that he thought of doing something desperate. He folded and refolded his coat which was lying on the bed. The telephone bell rang and he said, "Don't answer it. If that is the sheriff calling, don't you dare tell him I am here." · She told him it was her husband talking from Diamond Springs. He said "You have been good to me," shook hands with her and went out of the house, after she had cautioned him not to get mad with Walter. In a few minutes she went to the yard for cobs and saw appellant going towards the toolhouse, when she heard a call .from her husband, such as he usually gave in returning from town. After

picking up the cobs she heard her husband call as if in agony, and ran on to the orchard gate, meeting the horse and buggy without a driver on the way. Near the gate she found her husband lying on his face, the appellant astride of his back, cutting his face and neck with a razor, both men struggling. She grasped the appellant by the collar and by pulling and jerking finally got him off her husband, whom she assisted to his feet, and with her arm supporting him they walked toward the house and she left him near the porch. He was bleeding profusely from a deep gash in the neck. Going into the house to call a doctor by telephone she found the appellant in the pantry feeling the edge of a case knife. Taking water and a towel she returned to care for her husband, who was lying on the ground, and tried to stop the flow of blood. In a moment or two the appellant appeared with a corn knife upraised. She said, "Oh, Tanny, please don't." He pushed her aside saying, "I am going to finish him." The wounded man raised his hands, saying, "Oh, don't, don't." He slashed the neck of the wounded man many times with the corn knife until he was dead, his head being almost severed from the body. His fingers were mutilated and wounds were found on other parts of his body. The appellant then left the scene, and was next observed in a pasture by the doctor coming in answer to the telephone call, to whom he beckoned, and coming out to the road, said, "He is dead, I killed him in self-defense." Being asked whom he had killed, he said, Mr. Newfarmer, and asked to be taken to Council Grove. This occurred on the road about a mile from the scene of the tragedy and soon after it occurred. At the appellant's request the doctor took him in his car to Council Grove. His clothes were bloody and injuries appeared upon his person, including a fracture of the nose. The doctor testified that he was rational at that time and that he took him to Council Grove at his own request, avoiding

Diamond Springs, which is about two miles from the Olsen farm, because appellant asked him not to go there. It appears that appellant threw the corn knife into a creek about a half mile from the place of the homicide, and then went on until he saw the doctor in his automobile in the road, and beckoned to him, as already stated. After his arrest he told one of the county officers that he had been afraid of Newfarmer for some time, and believing that Newfarmer had gone to town to make trouble he had armed himself with a razor; that Newfarmer called him a name and rushed after him; that there was a tussle and he had to do what he did. The witness remarked to him that Newfarmer was on his face when they were found and that it did not seem necessary to slash him with a razor—that he was in no imminent danger. Whereupon the appellant replied that it was true and that he had "lost his head." The witness further said to him, may be he "would have come out all right, if you had n't followed him up to the house and slashed him with a corn knife," to which appellant answered, "Yes, but I was so mad I could n't hold myself."

The appellant and Newfarmer rode to town and returned together on the Saturday when notice of the discharge was given. There was no evidence of any previous quarrel or misunderstanding. Evidence was offered of the good character of the appellant, who is an unmarried man, twenty-seven years of age. He was transacting ordinary business in town on Monday just before his interview with Mrs. Newfarmer on the day of the homicide. There was evidence tending to show insanity of his mother, although it does not appear that she had ever been taken to an asylum. The deceased was twenty-three years old.

The material facts of the homicide were undisputed. The defense of insanity was interposed. In opening the case the appellant's counsel stated that there would be but one question for the jury to determine, and that

was the mental condition of the defendant at the time he committed the act—which he stated was that of an insane man.

It is contended that several jurymen were incompetent because they had formed opinions upon the issue to be tried. They stated that they had such opinions, but on further examination by the county attorney, and in answer to inquiries by the court, these opinions appeared to be limited to the fact of killing, which was undisputed, and would therefore not disqualify, or were only impressions from newspaper reports. They were not asked whether they had any opinion concerning the sanity of the appellant, which was the material question, nor was that matter suggested upon their examination. Some of the answers of jurymen appeared to be conflicting, those given in response to questions by the defendant tending to show settled opinions, while those given in answer to questions of the county attorney showing the contrary. Doubtless in this as in other cases the seeming inconsistency is due to the use of the terms opinions and impressions, and the variant senses in which they were understood. Within the rules stated in *The State v. Morrison,* 67 Kan. 144, 72 Pac. 554, *The State v. Stewart,* 85 Kan. 404, 116 Pac. 489, and *The State v. Truskett,* 85 Kan. 804, 118 Pac. 1047, the rulings complained of must be sustained.

The prosecuting attorney said in his opening argument:

"I suppose that the Captain will be telling you in a few minutes that he is not a murderer; he had that privilege. Maybe he can show you that he is not, but he can't show it on the evidence in this case. . . . The witnesses who have testified to it in this case, I believe, knew that. But can it make any difference to this jury what his reputation had been heretofore, when he admits that he did this thing. If he had denied having—or if his counsel had denied"—

Counsel was interrupted by an objection and an exception was taken to the remark "If he had denied having—or if his counsel had denied." That the killing was done and that it was a cruel murder unless it was the product of insanity must be conceded. In their brief counsel for appellant say:

"That the testimony shows the killing to have been an insane act, a demoniacal one, without motive, purpose or accountability. There was but one eye witness, the wife of the man who was killed. Her story shows a maniacal act, devoid of any mental accountability."

The remark objected to appears to have referred to the admissions of the appellant to witnesses that he had committed the act and to the statement of his counsel, rather than to his failure to testify, which the statute declares shall not be referred to. It is not believed that the appellant could be prejudiced by a reference to the fact that he had not denied the killing, the very circumstances of the killing being urged as an argument to show his insanity.

It is also argued that error was committed in an instruction which informed the jury in substance that they should not consider the fact that the defendant did not testify as a witness as raising any inference of his guilt. It is argued that this called attention to a matter which the jury had no right to consider. The fact, however, was already known to the jury, and the caution was designed not to call attention to it but to warn them that the appellant must not be prejudiced by it. The court sought to give the appellant the benefit of the statutory safeguard and in doing so only declared the law.

Objection was also taken to the language of the county attorney in his opening argument, wherein the jury were told that they might protect the appellant "under the guise of a passing brain storm, . . . but he is a murderer." The facts were stated which it was claimed proved the charge that he was a murderer and

The State v. Olsen.

not insane, and in that connection the term was used and the jury must have so understood it. While all vituperation and vilification should be avoided, inferences fairly deducible from the evidence and predicated thereon may be stated. But all unwarrantable conclusions, vilifying epithets and personal abuse should be excluded.

A daughter of Newfarmer three years old was present when her father was being wounded with the corn knife and exclaimed as the tragedy proceeded, "Oh, poor papa, do die." The admission of this statement is alleged as error. It was one of the circumstances attending the homicide related by the mother in her recital of the events. The remark was a mere incident of the tragedy. It is argued that the child was too young to be an intelligent factor, and that what she said was no more than the chirp of a swallow. Granting the truth of this observation no harm was done by the recital. It is said that this statement chilled the blood, but that was the natural effect of the whole dreadful story, regardless of accompanying exclamations, whether made intelligently or as childish prattle.

Requests were made for instructions to the effect that there was no charge of killing with a razor, and if there was a reasonable doubt whether death resulted from wounds with that instrument there could be no conviction. Without-considering the question of supposed variance here suggested, it is sufficient to say that the man was alive when attacked with the corn knife. With the assistance of his wife he had walked several yards from the place of the first encounter, talking by the way. He exclaimed "Don't, Don't," when the corn knife was upraised to strike, and he died while being furiously slashed by that instrument. Even if the previous wounds were mortal, of which there was no proof, death was hastened by the new assault, which is sufficient to sustain the charge. (2 Bishop's

New Criminal Law, § 639; *People v. Moan,* 65 Cal. 532, 4 Pac. 545.)

In support of the defense of insanity the defendant called several medical witnesses to whom a hypothetical question was put, eliciting an answer, based upon the truthfulness of the hypothesis, that the appellant was insane when the fatal act was done. Doctor Uhls, on cross-examination, said he presumed it to be emotional insanity—might be a species of moral insanity; that emotional insanity did not necessarily have to do with crime. "On facts stated in that question it would have to be under some distinct classification as to the kind of insanity he was laboring under; that is what is commonly referred to as emotional insanity; he acts on the impulse; it comes quickly and goes quickly, usually." Doctor Smith said: "Would say emotional insanity, . . . similar to what we sometimes refer to as irresistible impulse. It comes quickly and recedes quickly." He also said that he was considering the predisposing element of heredity from testimony he had heard. Doctor Crawford said:

"It is my opinion that he was suffering from emotional insanity. . . . There is an element of heredity in it; probably heredity may be a partial cause for the insanity. . . . I did n't answer it (the hypothetical question) either in the affirmative or negative; there are several things in there that makes me say that man was insane; his conduct at the time, during the day, prior to his having committed this offense and at the time of the commission of the offense; the fact of his being despondent, and wanting a shotgun, and looking for a shell to shoot a steer; the fact of his folding and refolding his coat would show he was in a nervous condition; don't know whether it was same condition as of man wavering as to whether he would commit murder or not; his mind would be very materially disturbed and might develop into emotional insanity; he would be in a condition of mind where emotional insanity might develop at any time if opportunity presented itself; could n't say it would recede as quickly

as it developed, but usually emotional insanity does n't last a great while."

Doctor Roby said in answering the question: "I think the man was very clearly insane." On cross-examination, he testified that "based on that question this kind of insanity would be fairly termed emotional insanity, or impulsive insanity, or there may be several names applied to it; . . . insanity is not classified alike by all writers; it would be similar to what we call irresistible impulse . . . sometimes it is termed moral insanity."

Doctor Packer answered the hypothetical question as follows:

"It is my opinion that from the time that the altercation took place to the time he was taken by Dr. Beam, he was violently insane, for some time before that time and for some time after, and he is still insane; I examined his mental condition yesterday; took very much time to it."

On cross-examination the witness testified this was an outburst of passion, "as a result of melancholia; not exactly a brain storm, similar; not a case of paranoia exactly; one of the principal factors that leads me to believe he was insane at the time was in that part of the transaction in which the struggle took place and they were separated and the attack was renewed; that was an insane motive; an insane act; it was without guidance, without thought, without direction; it was abnormal, impulsive; it was acute rage; it was an extreme congestion of the cerebrum and the cerebellum, in which he had no control of his actions and no control of his thoughts; would n't pretend to say how many kinds of insanity there are; there are very many. An insane condition is one in which the mental powers are not in normal balance; believe this is hereditary insanity; that element is embodied in the question."

Doctors Roby and Packer testified that they had ex-

10—88 Kan.

amined the appellant the day before their testimony was given as to his mental condition, and were asked to state what that condition was. Objections were sustained. The appellant then offered to prove by these witnesses that he was insane at the time of the examination. The offer was excluded and the ruling is assigned as error. Before examining this objection it should be stated that Doctor Packer had already testified that he found the appellant insane on the previous day and a repetition of the evidence was unnecessary. The rejected offer of proof by Doctor Roby remains to be considered.

Ordinarily in determining the sanity of a person his mental condition before and for a reasonable time afterwards may be shown, as an aid to the jury in finding whether he was sane at the time when the act under consideration was done, and the evidence was admissible, the jury being instructed that from all the evidence they must determine his mental condition at the time of the homicide. It does not follow, however, that the judgment should be reversed because of this ruling. The opinions of the experts are in substantial harmony, to the effect that the insanity disclosed by the facts stated in the hypothetical question evinced emotional or moral insanity, or an irresistible impulse. One doctor, we have seen, refers to acute rage among the conditions of his mind.

It was said in *The State v. Nixon,* 32 Kan. 205, 4 Pac. 159:

"The law will hardly recognize the theory that any uncontrollable impulse may so take possession of a man's faculties and powers as to compel him to do what he knows to be wrong and a crime, and thereby relieve him from all criminal responsibility. Whenever a man understands the nature and character of an act, and knows that it is wrong, it would seem that he ought to be held legally responsible for the commission of it, if in fact he does commit it."   (p. 212.)

This principle was approved in *The State v. Mowry,*
37 Kan. 369, 376, 15 Pac. 282, and again followed in
*The State v. O'Neil,* 51 Kan. 651, 33 Pac. 287, and *The
State v. Arnold,* 79 Kan. 533, 100 Pac. 64.   In the
O'Neil case it was said:   .

"We are not willing to change the ruling of this court
in favor of irresponsibility on account of uncontrollable
impulse, where the perpetrator is fully conscious that
the act he is doing is wrong and criminal.   If the law
as declared by this court does not offer sufficient safe-
guards and protection for 'that most unfortunate class,
who can not speak for themselves,' an act of the legis-
lature may establish a different rule.   Until the legis-
lature interferes, we prefer to follow the great weight
of authority upon this matter.   We are not inclined to
adopt the theories of psychological enthusiasts to over-
throw the long-established criminal practice in this class
of cases, which is based on human experience from
earliest times."   (p. 681.)

No one testified that the defendant did not have the
mental capacity to understand the nature and quality
of the act or to know that it was wrong.   His mental
capacity at the time of the act being the material ques-
tion, the state of his mind some time afterwards was
not important unless it tended to show its condition
at that time.   It is said:

"But in order to ascertain a person's mental con-
dition at the time of the act in question, it is permissible
to receive evidence of the condition of his mind for a
reasonable period both before and after that time,
especially where it is claimed that his disorder is of a
continuing or permanent character."   (16 A. & E.
Encycl. of L. 614.)

It does not appear to have been claimed that the al-
leged mental malady of the appellant was of a continu-
ing or permanent character, and the medical testimony
tended to prove that it was not.

In *Moore v. Commonwealth,* 92 Ky. 630, 18 S. W.
833, in reviewing a ruling rejecting evidence of the

condition of mind of the defendant after the homicide, the court said:

"To sustain this defense (insanity) the evidence must of course show the party to have been insane at the time of the doing of the forbidden act. It is of course not sufficient to show that he was insane before or after; but if there be testimony, as there was in this instance, tending to show that his affection is of continuing or permanent character, then it is competent to prove his mental condition after as well as before the time when the act was done." (p. 635.)

While in the case last cited the conviction was reversed because of the rejection of the testimony offered, it will be seen that it was because there was testimony tending to show that the malady was of a continuing character. No such evidence was given in this case. On the contrary it appeared from the medical testimony that whatever the disorder or affection of the mind was at the time of the fatal act it was of a temporary, sudden, or impulsive nature, variously characterized as moral, emotional, or irresistible impulse. It was said in *French v. The State,* 93 Wis. 325, 67 N. W. 706, "That the acts, conduct, or declaration must be so connected with, or related to, or result from, the mental condition of the accused at the time the offense was committed, as to throw light upon or illustrate such condition, and possess some material and practical probative force, and, when taken in connection with other evidence in the case, tend to show that the defendant was insane at the time of the homicide." (p. 342.) In that case the inquiry related to the condition of the accused four days after the homicide, and its rejection was held erroneous. It was held in *The State v. Newman,* 57 Kan. 705, 47 Pac. 881, that where insanity is interposed as a defense testimony of the defendant's state of mind shortly before and after the homicide may be received as tending to show his mental condition at the time. If it is apparent in any case,

from the nature of the disorder or otherwise, that the evidence would not tend to show a condition claimed to exist at the time of the act in question, it could have no probative force with respect to the issue to be tried, and its rejection is not, in such a situation, prejudicial. The ruling complained of must be viewed not only in the light of the testimony already given in behalf of the defendant, showing the nature of the mental disorder claimed, but also in the light of the defense interposed. It was not claimed until this evidence was offered that the appellant was still insane, but only that he was insane when he killed Newfarmer. It should also be observed that there was no offer to prove that in the opinion of the witnesses the appellant did not have the capacity to know the nature or quality of the act, or to know that it was wrong, but merely to show that he was insane. The sudden madness or mental disorder already testified to by the same witness not being continuous in its nature would have no necessary relation to his mental state at that time, and if any other or different phase or kind of insanity was claimed to exist the offer should have included it.

It is also argued that the evidence should have been received for another purpose, viz., to determine whether reasons existed for halting the trial and instituting proceedings to determine whether the appellant was then insane. (*In re Wright*, 74 Kan. 409, 89 Pac. 678.) This evidence was offered after the state had rested its case and a large majority of the defendant's witnesses had given their testimony. At that stage of the trial it must be presumed that counsel for the appellant had knowledge of the facts necessary to determine the nature of proceedings that should be taken on the part of appellant, and if an interruption of the trial to make an inquiry into his mental condition was deemed advisable they certainly would have taken some step, or made some request to that end. Nothing of the kind had been suggested before and no such suggestion was

made then or afterwards. It is true that if the presiding judge from his own observation at the trial, or from the evidence, believed that reasonable grounds existed for making an inquiry to determine whether the appellant was then mentally capable of making his defense, it could have been ordered without a formal application, but in the absence of a motion, or request of any kind, it must be presumed that the court in the exercise of a proper discretion found no cause to do so. There was no other showing of any facts or conditions to suggest an inquiry. If counsel intended to offer this testimony as a ground for abating or delaying the trial for such an inquiry, or if that was one of the purposes, the court should have been so informed, otherwise it was reasonable to suppose that it was offered upon the general issue. Doubtless the court so treated it, and it should be so treated here. The judgment should not be reversed upon a matter to which the attention of the trial court was not directed or its action invoked.

The abstract does not contain the hypothetical question asked of the expert witnesses. Assuming, however, that it correctly stated facts which the evidence tended to prove, it is insisted by the state that it did not include other facts showing motive. In the parts given in the brief of the state no statement appears of the improper proposal of the appellant to Mrs. Newfarmer and his conduct with reference to it. This was a material matter, which might lead to an understanding of his motive and the state of his mind.

Other objections to rulings upon evidence do not appear to require comment.

It is argued that the savage ferocity of the act affords proof of insanity, but whether proceeding from madness or malice, whether from an irrational mind or a mind aflame with malevolence, were questions for the jury. If merciless cruelty in killing another should always be ascribed to insanity when no mental disorder had preceded, then the ferocity of its perpetration

might furnish immunity for the deed. Whether the means and circumstances of a homicide in connection with other evidence prove a mind diseased or one on fire with passion must be left to the determination of a jury. The verdict in this case, approved by the trial court, is amply supported by the evidence; and, finding no rulings requiring a reversal, the judgment is affirmed.