THE STATE OF KANSAS, *Appellee*, v. ALICE M. MILLER, *Appellant.*

No. 18,253.

SYLLABUS BY THE COURT.

1. ABORTION—*Information—Charge Sufficient under Statute.*
The legislature, by section 2532 of General Statutes of 1909, made the willful administration to any pregnant woman of any medicine, drug or substance whatsoever, or the employment or use of any instrument or means whatsoever, with intent thereby to procure an abortion or the miscarriage of such woman, with no medical advice or necessity therefor, a misdemeanor, regardless of the character of the things administered or used.

2. ——— *The Term "Means Whatsoever" Construed—Ejusdem Generis.* The term "any instrument or means whatsoever" is not limited by the rule of *ejusdem generis*, rules of construction applying only in case ambiguity or uncertainty calls for aids to a correct construction of a statute.

3. ——— *Bill of Particulars in Criminal Case—Judicial Discretion.* The matter of requiring a bill of particulars in a criminal case is discretionary and when no abuse of discretion is shown no error is committed in refusing such bill.

4. INSTRUCTIONS—*To Entire Panel at Opening of Term.* The statute prescribes the time and manner of instructing juries, and if at the opening of a term it is thought best to address the panel generally touching their duties, care should be used to avoid suggestions or statements likely to influence their decision when called upon later to sit in a given case.

5. ABORTION—*Statement of Prosecutrix as to Parentage of Child—Competent Evidence.* The theory of the state was that the father brought his daughter to the defendant to be relieved of a trouble which he had caused, and that she was received by the accused for the accomplishment of such purpose. Having formerly stated that a brother was the cause of her condition, the daughter testified that she thought he was, and was then asked if any other person had had intercourse with her along about that time, to which she answered, "Yes,—father." *Held,* competent as tending to show the real situation and the knowledge and motive of the defendant.

6. ——— *Evidence that Midwife Filed Certificate of Birth of Child—Competent.* The accused, a registered midwife, attempted to show that a few days after the birth of the child

The State v. Miller.

she made out and forwarded to the local registrar a cer-
tificate of birth, and for that purpose offered, among other
things, a copy of such certificate, certified by the state regis-
trar to be a true copy of the certificate on file in his office,
which was refused. *Held,* that such document was receivable
under section 369 of the civil code, and was competent to show
the defendant's conduct and connection with the matter form-
ing the basis of the charge against her.

7. ———— *Instructions Relative to ˙ Circumstantial Evidence
Should Have Been Given.* While much direct evidence was in-
troduced, the guilt of the accused depended upon the inter-
pretation and probative force of the circumstances shown by
such evidence, and it was error to refuse the usual instruction
as to circumstantial evidence, and give none on that subject.

8. ———— *Argument of Counsel—Vituperation.* While counsel
should present their cause free from personality and vitupera-
tion, still the provocations and limits which should be con-
sidered and observed are primarily within the discretion of
the trial court, and unless comments upon the evidence and
character of the accused are so improper and unwarranted
as to prejudice the jury against him and deprive him of a fair
trial they will not justify a reversal.

9. NEW TRIAL—*Newly Discovered Evidence—Cumulative.* Mo-
tions for new trial on the ground of newly discovered evi-
dence, when not supported by a sufficient showing of dili-
gence, and when such evidence is cumulative or merely con-
tradictory of that already given, may properly be denied.

Appeal from Sedgwick district court, division No. 1.
Opinion filed July 5, 1913. Reversed.

*S. B. Amidon, D. M. Dale, Jean Madalene,* and *B. F.
Hegler,* all of Wichita, for the appellant.

*John S. Dawson,* attorney-general, *George McGill,*
county attorney, *R. C. McCormick,* deputy county at-
torney, and *W. A. Blake,* deputy county attorney, for
the appellee.

The opinion of the court was delivered by

WEST, J.: The defendant appeals from a conviction
of the offense of employing means and administering
substances with intent to procure an abortion and mis-

carriage. Six hundred ninety-seven pages of abstracts, two hundred seven pages of briefs, and one hundred three assignments of error are presented for our consideration, and such brevity of statement as is possible under the circumstances will be used in giving our views.

Section 2532 of General Statutes of 1909, under which the information was drawn, reads as follows:

"Every physician or other person who shall willfully administer to any pregnant woman any medicine, drug, or substance whatsoever, or shall use or employ any instrument or means whatsoever, with intent thereby to procure abortion or the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, or shall have been advised by a physician to be necessary for that purpose, shall upon conviction be adjudged guilty of a misdemeanor, and punished by imprisonment in the county jail not exceeding one year, or by fine not exceeding five hundred dollars, or by both such fine and imprisonment."

The information charged that the defendant "from the 5th day of December, A. D. 1911, and each day thereafter until the 12th day of December, A. D. 1911, . . . did then and there during each said days unlawfully, willfully and intentionally cause one Goldie Chadwick to walk and run in and about a certain room and up and down flights of stairs, and . . . did then and there unlawfully, willfully and intentionally administer to her, the said Goldie Chadwick, certain medicines, drugs and substances, a more particular and definite description of which your informant is unable at this time to give, for the reason he does not know the same, she, the said Goldie Chadwick, being then and there at all of said times a woman pregnant with child"; followed by the allegations that the intent was to produce an abortion and miscarriage and that there was no necessity or medical advice for such acts. It is vigorously urged that the absence of an allegation that the

walking and running and the medicine given were cal-
culated to produce an abortion and the failure to charge
the kind of substances administered render the informa-
tion bad, and that the doctrine of *ejusdem generis* pre-
cludes embracing within the charge other than means
kindred to the giving of drugs and the use of instru-
ments. But viewed from a practical and common-sense
standpoint it is clear enough that the defendant was
very well advised that she was called on to meet a claim
by the state that she had used the means indicated with
the intent to produce an abortion and miscarriage. The
legislature has made such conduct a crime without stop-
ping to provide that the medicine, instruments or means
used be such as are calculated to produce the intended
result. The rule of *ejusdem generis* is merely one of
construction, and like all the rest is useless when the
intention is so plain as to require no resort to canons
of construction. Such rules and canons are of use only
when ambiguity or uncertainty calls for aids to a correct
solution. (*The State v. Prather,* 79 Kan. 513, 516, 100
Pac. 57; 36 Cyc. 1119.) To make assurance doubly
sure the legislature has enacted the common-sense rule
into law and provided that "Words and phrases shall
be construed according to the context and the approved
usage of the language." (Gen. Stat. 1909, § 9037,
subdiv. 2.) The phrase "any instrument or means
whatsoever" carries the facial evidence of a legislative
intent to cover the extent of the criminal machinations
and devices of the abortionist in order to protect the
pregnant woman and the unborn child. Whatsoever
in the law, like whosoever in the gospel, is a word of
the widest import. It is suggested that while one might
administer a known deadly poison which would imply
the intent to take life, he might give a substance not
known to him to be naturally productive of an abortion,
and hence to charge him criminally it would be neces-
sary to aver knowledge. The fallacy of this argument
as applied here lies in the fact that the statute has made

it a crime to administer anything with intent thereby to procure an abortion or miscarriage, thus making the act and intent sufficient regardless of the character of the substance administered.

Error is assigned on the refusal of the court to require a bill of particulars, and *The State v. Reno*, 41 Kan. 674, 21 Pac. 803, is cited as fixing the Kansas rule. That, too, was a misdemeanor case, and the court said a bill of particulars might in the discretion of the trial court have been required, but that "such bill of particulars will be required only in cases where the indictment or information does not of itself definitely and specifically set forth the facts, but sets them forth only vaguely or in such general terms that the defendant could not well know what he is required to defend against." (p. 679.) While some states do not recognize the practice at all, in most courts the requirement is discretionary. (*The State v. Lindgrove*, 1 Kan. App. 51; *Rosen v. United States*, 161 U. S. 29; *Dunlop v. United States*, 165 U. S. 486; 22 Cyc. 371.)

In *Mathis v. State*, 45 Fla. 46, 34 South. 287, the supreme court of Florida gave an exhaustive review of the authorities, English and American, showing that the matter is one of discretion. No material abuse of discretion is apparent in this case.

The defendant challenged and moved to quash the venire on account of certain alleged instructions given on the opening day of the term, two weeks before the trial began. The examination of the panel on their *voir dire* does not appear and it must be presumed that they showed themselves qualified to sit in the case. It is contended, however, that the array were so influenced by the remarks of the court the first day of the term that they were in fact disqualified. The challenge was overruled, and it is necessary to consider the error assigned thereon. It appears that at the beginning of the term the court gave to all the assembled jurors an extended address touching the duties they were to enter

upon, covering a wide field and including various ob-
servations relative to the court's previous experience
in the trial of cases. In some respects it was a sort of
fireside talk and in others a more formal chart for their
admonition and guidance. The intention was stated
"to make a few suggestions to the jury simply for the
purpose of facilitating the trials that will come before
us." Suggestions were offered as to a hoped for ac-
quaintance and mutual regard, the valuable experience
about to be had, promptness in attendance, conduct in
the jury room, secrecy of their proceedings, discussing
the verdicts outside, sending for evidence or instruc-
tions to be reread, the desirability of agreeing and the
unwisdom of stubborn contention, certain expected in-
terrogations concerning their connection with the Anti-
Horse Thief Association, the effect on their minds of
a complaint or information already made in a given
case, their duty to come to no decision until all the evi-
dence and instructions were in, their being a constit-
uent part of the court as much as the judge, the bore
of numerous special questions and their duty never-
theless to answer them correctly, the avoidance of quo-
tient verdicts, the propriety of refraining from reading
newspaper accounts of trials on which they were sitting.
Of these no complaint is or could justly be made. Dur-
ing the address, however, the following statements were
made, of which the defendant bitterly complains:

"Some of these attorneys who are interested in some
of these criminal cases and are representing some de-
fendants are pretty jealous of the defendants' rights,
as they call them, and they probably want to know if
the court is saying anything at this time that may pos-
sibly prejudice the rights of their defendants, so in case
their defendants happen to be convicted they might lay
the foundation for error, you know, to the supreme
court; so they have the habit, sometimes, of sending
stenographers up here to take down what I am saying
to you gentlemen now, and they are perfectly welcome
to do so. I have no objection whatever. I will say
nothing except absolutely in the interest of justice. I

want every defendant who is charged with a crime to have an impartial and fair trial, but I do not believe it is the right of any lawyer to go beyond reasonable lengths to acquit a guilty person. They have the right to the best defense they can. But when they are guilty they ought to be convicted when the state makes a case beyond a reasonable doubt; and, as I say, any lawyer is welcome to all I have got to say here to you gentlemen, or any other time. And if there is anything improper in any of my remarks I am ready to meet that issue when it is raised, but I do believe it is my.duty to make such suggestions as I feel are right, for the purpose of working out justice in this case.

"I never, in my life, have seen but one man convicted in this court room that I had any reason to believe that he was not guilty. There was one such person convicted and he got a new trial, and he was not convicted again; and you men need not be afraid to put a little bit of responsibility on the court, and if you should happen to go wrong, remember that in all these trials there are thirteen men who compose the jury—twelve in the box and one who sits up here, and before your verdict can become final and fixed the thirteenth juryman, who sits up here, must coincide with your views; so you need not get scared in these matters, and if you go very far wrong there is still a way to correct that wrong. . . . And my experience has taught me that there are more than one hundred guilty men who escape to one innocent man convicted. Now that is putting it pretty strong; since I have been here on the bench I have seen several hundred convicted, and with one exception—now it is better than eight years—with one exception I have never seen but one person convicted that I thought was innocent. And as I said before that person got a new trial and was never tried again. But I would rather lose my arm than to send to the penitentiary a person whom I believe innocent. I don't believe it is possible for a situation to arise where it would become the duty of a judge to send to the penitentiary a person whom, in his heart, he. believed innocent. I would not do it under any circumstances, and I would absolutely detest a judge who would be so heartless and so inhuman as to sentence to the penitentiary a person whom he believed innocent. I don't care if he had been convicted a dozen times by a jury. I think when a person is convicted by a jury, whom

The State v. Miller.

the judge feels in his heart is innocent, he should grant a new trial and keep granting a new trial until that person is discharged or declared not guilty. But I have never seen a jury do that but once. I have seen many a person turned loose when I felt down in my boots that he was as guilty as sin. And the jury found otherwise and the state may have fallen down in its proof—was n't able to show to the jury beyond a reasonable doubt—and the jury turned him loose, notwithstanding that the judge of the court had an entirely different opinion of it; but, on the other hand, I do say that if the state proves the guilt of a defendant beyond a reasonable doubt that the public has some right, just as well as the individual, and it is your duty as jurors to see that the rights of the public are protected, as well as the rights of the individual. There are two sides to these criminal cases. The public has got some rights. But I do not apprehend you will have any trouble along these lines."

It is urged that this proceeding was to the material prejudice of the defendant and in violation of the statute prescribing when and how instructions shall be given. The three cases relied on principally to support the claim of error are *State v. Wright* (Mo. App. 1912), 144 S. W. 175; *Green v. State* (Miss. 1910), 53 South. 415; and *Jones v. State* (Tex. Crim. App. 1899), 51 S. W. 949. In the Wright case the judge, on sustaining motions for change of venue, delivered a long address, in the presence of the panel, against the practice of making such motions and in effect charging the defendants and counsel with falsely claiming prejudice as an excuse for delay. This was held by the court of appeals to render the panel incompetent to sit in the trial of the cases in which such applications had been made, another judge having been called in to try such cases, although each juror stated that the address had not influenced him to the prejudice of the defendant. In *Green v. State,* supra, the judge, during the trial, sent for additional jurors and instructed the deputy sheriff to summon young men as talesmen, stating, "We want to break this nigger's neck" (p. 416), referring to the

defendant on trial. The accused exhausted his peremptory challenges before reaching the talesmen who had heard this remark, and it was held that a new trial ought to have been granted. In the Jones case, on appeal from a conviction of assault with intent to murder, it was shown that on the day the jury were impaneled, and before the trial of any case began, the court called all the jurors to the same side of the bar and gave them a verbal charge as to their duties. Their attention was called to the law of reasonable doubt, because, as stated, the law restricted the court from giving it in particular cases as they arose. Among other things said by the court were the following:

"I don't think I ever saw an innocent man convicted. We hear of them now and then way off, but, like the bag of gold at the end of the rainbow, when we approach they vanish. Now, I believe, and I think every right-thinking man thinks with me, that it is better that an innocent man be convicted now and then than that ninety-nine bloody murderers, burglars and robbers be turned loose upon the country. This doctrine of reasonable doubt, as urged by shrewd lawyers in this state, has no application, and should have no weight with jurors." (p. 950.)

The famous hip-pocket defense in homicide was denounced, and it was said:

"If the innocent man is convicted, he can appeal to the higher courts and get his case righted. . . . I charge you to recollect these matters, and be guided by these general instructions in the trial of each and every case that shall be submitted to you in which such matters will arise, and hope that your conduct as jurors will conform to them; and if you, as jurors, are guilty of any improper conduct, I will give you notice right now that the one or ones so guilty will be fined not less than one hundred dollars, and the one so fined will not get it remitted." (p. 950.)

This language was severely censured by the appellate court, but for various reasons given it was held

The State v. Miller.

not to be materially prejudicial. Those who have had experience as trial judges know how much easier it is to criticise their conduct and rulings than to perform their arduous and perplexing duties free from error. The address in question contained many practical and commendable suggestions to the men about to enter upon duties new and in a degree mysterious to them, and while we think the concededly able and admirable trial judge crowded the danger line in some of the quoted remarks, which should have been omitted, we are not convinced that all of those made, taken together, precluded those to whom they were directed from heeding and following proper instructions in a criminal case tried two weeks later.

We have carefully examined each complaint touching the admission and rejection of evidence and find no prejudicial error or necessity for discussion in any save two, which will now be noticed. The theory of the state was that the father brought his daughter to the defendant to be relieved of a trouble which he had caused. The defense was that she was brought merely for proper care during confinement. No further reference than necessary will be made to the revolting matters testified to by various witnesses. The girl, who was fifteen years old, had stated that her brother was the cause of her condition, and upon the trial she stated that she did not know but thought it was the brother. She was then asked if any one else had intercourse with her along about that time and answered yes, that her father had. The defendant argues that the only purpose of this testimony must have been to show that the father brought the daughter to the defendant's place for the purpose of having an abortion committed. But if such were the purpose and the fact it would be competent as bearing upon the knowledge and intent with which the defendant received the girl, and it was not error to receive the statement.

The other matter concerns an attempt to show that

the defendant, who was a registered midwife, made out and transmitted a birth certificate after the child was born. The defendant testified that the birth occurred Monday morning, December 11, and that on the following Thursday morning she made out the certificate. Her attention was then called to "Exhibit D," purporting to be a printed certificate signed by the defendant stating that Goldie Veres Chadwick had given birth to a child named May Belle Chadwick, father Sylvester Chadwick. The blanks for names of county, township and city were not filled out, but the number "2528 E. Second Street" would seem to indicate the location of the defendant's place. It also purported to bear the signature of William Sence, registrar, and to it was added or attached his certificate that it was a true copy of the one on file in the office. This exhibit was objected to as incompetent, irrelevant and immaterial, no proper foundation having been laid, and also as a self-serving act on the part of the defendant. Upon sustaining the objection it was stated that it was desired to show by this certificate that on the second or third day after the birth the defendant filed with the city clerk of Wichita the certificate of birth marked "Exhibit D," and to offer a copy thereof certified by the city clerk, and to show that the city clerk sent the original to Topeka where it then was. A similar objection to the one last made was sustained to this statement or offer. The defendant was then asked if she reported the birth to the city clerk, to which an objection was sustained. An offer was then made to show that she reported to the city clerk the time of the birth, the name of the mother, the name of the father, the day of the birth, the sex of the child, which was objected to, whereupon the prosecutor was asked by the court if he waived the objection that it was not the best evidence, and replied that he objected on that ground. The objection was sustained. The city clerk was

put upon the stand but not permitted to testify to receiving the certificate, or, rather, his statement that he remembered the defendant's sending him one was stricken out and the jury admonished not to consider it. In was then attempted to be shown by this witness that about the 17th or 18th of December the defendant mailed to him a certificate of which "Exhibit L" was a copy, that he filed it and then forwarded it to Topeka. This exhibit was certified by the state registrar as a true copy of the original on file in his office and purported to show that at the county of Sedgwick, city of Wichita, No. 2528 E. Second Street, Goldie Veres Chadwick gave birth to a female child, May Belle Chadwick, father Sylvester Chadwick, white, farmer, Sawyer, Kan., and that it was born alive, 4:50 A. M. "Filed 12/26/1911, Wm. Sence, Registrar." This was also excluded. One peculiar thing about these documents printed or photographed in the record is that the latter gives the date of the birth as "Nov. 11, 1911" and the former "Nov. 11, 1912." Section 10 of chapter 296 of the Laws of 1911 makes it the duty of a midwife to file a certificate of birth, according to the rules and regulations of the state board of health, with the local registrar within ten days after the date of the birth. The state registrar is required to permanently preserve the returns received monthly from the local registrars, and upon request to furnish a certified copy for the prescribed fee. Such certified copies are by section 369 of the civil code made receivable in evidence, with the same effect as the original, without proof that the original is not in the possession or under the control of the party desiring to use it. It was error, therefore, to exclude "Exhibit L" as not the best evidence. There was a dispute as to whether the child in question was the one exhibited in the court room, and whether Goldie Chadwick's child was born naturally or prematurely. It seems to be the theory of the state that the

16—90 KAN.

child was in fact made way with immediately after the mother was delivered, and considerable testimony touching the matter was given. It is now argued by the state that the certificate was not part of the *res gestæ*. Possibly not, but it was proper evidence bearing upon the question whether the defendant had pursued the natural and proper official conduct of a registered midwife acting *bona fide* and not seeking to cover up an attempted abortion, and she was entitled to show that she obeyed the requirements of the law touching a certificate of birth, and it would have been for the jury to say what her motive was in so doing. The charge and much of the evidence were of a character naturally to breed indignation in the hearts of the triers, and for that reason it was more than ordinarily essential to a fair trial that the defendant be permitted to show what she did respecting a public record of what she claimed to have been a natural birth. What the defendant did in her professional capacity before, at and after the birth was proper to be shown, so that the jury could be informed as nearly as possible as to her entire part in the matter and the purpose which actuated her.

The instructions were admirably clear and correct in respect to all matters covered, but no mention was made of the familiar rule as to circumstantial evidence when circumstances alone are relied on for a conviction. Instruction No. 12 requested by the defendant embodied the rule; and instruction No. 13 contained an elaboration thereof, so that the attention of the court was thus doubly called to the matter. While the circumstances were shown by direct evidence the guilt of the accused depended alone on the interpretation and probative force of such circumstances, thus making the case one to which the rule in question was applicable, and it should have been given. (*Carl Horne v. The State of Kansas,* 1 Kan. 42; *The State v. Fry,* 40

Kan. 311, 321, 19 Pac. 742; *The State v. Andrews,* 62 Kan. 207, 61 Pac. 808; *The State v. Gereke,* 74 Kan. 196, 86 Pac. 160; *The State v. Link,* 87 Kan. 738, 125 Pac. 70.)

In the argument of the case to the jury the county attorney said that when the defendant told them that she did not know how to perform an abortion she committed willful and corrupt perjury; that unless they showed consideration for the prosecuting witness it would be but little use to try to convict any woman or man, and speaking of the accused said, "Will you turn her loose to practice her beastly profession upon the people of the state of Kansas?" Of course, theoretically, counsel for both sides should with fairness present their cause free from personality and vituperation. But, actually, things are not always done that way. The writer knows from personal experience the dynamic and explosive forcefulness with which counsel for the defendant sometimes pursues the prosecution and the prosecutor, and it is too much to expect the latter to assume the role of a lamb when assailed by the roar of a lion. Again, if in any case a witness does in fact commit unquestioned and palpable perjury no rule of law precludes counsel from using Saxon language in calling the attention of the jury to what they have already observed and heard. Usually such matters may be and are controlled by the trial court, who knows better than we can the provocations and limits which should be considered and observed. The rule as stated in *The State v. Baker,* 57 Kan. 541, 46 Pac. 947, *The State v. Hinkley,* 81 Kan. 838, 106 Pac. 1088, and *The State v. Olsen,* 88 Kan. 136, 127 Pac. 625, does not warrant the holding that error materially prejudicial to the defendant was committed in this respect.

Finally, it is argued that the court erred in denying the motion and supplemental motion for a new trial.

We find no showing of diligence as to the first, and in support of the second an affidavit of the accused stated that the prosecuting witness, after this trial, in a case against her father, testified in another county against him, but after his conviction she made the statement that her testimony given in the trial of this case in relation to the defendant was false. The court considered both motions but deemed them and the showing made insufficient, and in this we agree. (*The State v. Lackey,* 72 Kan. 95, 82 Pac. 527.)

The court is of the opinion that the certified copy of the certificate of birth should have been admitted, and that the jury should have been instructed as to circumstantial evidence, and that, considering all things shown by the record, the defendant is entitled to a new trial.

The judgment is therefore reversed and a new trial ordered.